H. S. HARKINS v. J. L. CATHEY, Clerk of the Superior Court of Buncombe County.

*Election    Law—Judges    of    Election—-Appointment·—Qualifications—Mandamus—Supreme   Court—Justices of Supreme Court—Jurisdiction.*

1. The election law of 1895 (Chapter 159, Acts 1895), conferring upon the judges of the Supreme and superior courts general supervisory jurisdiction over clerks of the superior courts in the performance of their duties under the election law, with power to issue rules on such clerks, and on the hearing thereof to make summary orders and directions for their proper enforcement, is constitutional.

2. Upon failure of a Chairman of the State Executive Committee of a political party to designate judges of election on behalf of such party, as provided in Section 7, Ch. 159, Acts of 1895, the persons appointed by the clerk of the superior court of a county must belong to the political party for which they are appointed.

3. Where the Chairman of the State Executive Committee of one political party fails to designate the judges of election for a particular county for and on behalf of such party, and the clerk of the superior court, under the exercise of the power of appointment given in Section 7 of Ch. 159, Acts of 1895, appoints persons not having the requisite qualifications, the Chairman of the Executive Committee of another political party in such county may bring *mandamus* to compel the clerk to appoint proper persons.

4. Under Section 7, Ch. 159, Acts of 1895, giving to the judges of the Supreme and superior courts supervisory power over the clerks of the superior courts in the performance of all the requirements of said act, a single justice of the Supreme Court has jurisdiction to remove judges of election appointed by a clerk, if they have not the requisite qualifications, and to order other and suitable persons to be appointed.

AVERY, J., dissenting

PETITION for a writ of *mandamus*, brought by H. S. Harkins, Chairman of the Republican Executive Committee of Buncombe county, to compel J. L. Cathey, clerk of the Superior Court of Buncombe County, to comply with the election law of 1895 in the appointment of judges of election, heard by Hon. D. M. FURCHES, one of the Associate Justices of the Supreme Court, on October 24, 1896. The opinion and order of his Honor are as follows :

" This proceeding is brought under Chapter 159, Laws of 1895, being " an act to revise, amend and consolidate the Election Laws of North Carolina," to compel the clerk of Buncombe county to comply with the provisions of the act in appointing judges of election.

It is alleged and admitted that the plaintiff is a resident and qualified voter in Buncombe county, and that the defendant is the clerk of the superior court of said county. It is alleged and admitted that Hal W. Ayer is the Chairman of the People's Party, which party voted more than thirty thousand votes in 1892, and that as such Chairman he had the right to designate to the defendant

the names of persons to be appointed judges of the election to be held in November, 1896. And it is alleged and admitted that he failed to make this designation on or before the first Monday in October, 1896, which was the 5th of October, but did so on or about the 13th of said month. And it was alleged by the defendant that, receiving no list from said Ayer, Chairman as aforesaid, he proceeded to make said appointments, as it was his duty under said act to do.

Upon the hearing of this case the defendant's counsel contended that, defendant having received no list from said Ayer on the 5th of October, it was his duty to proceed to make said appointments without such list, and without regard to what party the appointees should belong, so that he observed the other qualifications contained in said act. And Mr. Davidson stated that, being called upon for his opinion by the clerk, he so advised him. But it was contended that, notwithstanding the opinion of Mr. Davidson, the clerk (the defendant) had in fact observed the distinctions between the different political parties; and as he had received lists from the chairmen of the Democratic and Republican parties,. which he observed, that he did appoint one Populist from each precinct except four, namely, 1st and 2nd precincts of Reem's creek, Avery's creek and Black Mountain precincts.

It was also contended that, these parties having been lawfully appointed, the court had no right to remove the incumbents and to fill or cause their places to be filled by other persons. It was further insisted that the plaintiff Harkins was a Republican and Chairman of the Republican Executive Committee of Buncombe county, and therefore he had no right to bring and maintain this proceeding.

This statement of facts presents the questions of law arising thereon and the contention of the parties.

This act, Ch. 159, Sec. 7, Laws 1895, gave to Mr. Ayer, as Chairman of the People's Party, the right to designate to the defendant the names of the persons to be appointed judges of election for his party in Buncombe county. Had this been done on or before the first Monday in October the defendant would have had no discretion, and it would have been his duty to make the appointments as designated. He would then have been but the agent provided by law to carry out the will of Mr. Ayer.

But, as he received no such list from Mr. Ayer on 'or before the first Monday in October, it then became his duty to make such appointments, observing the require- ments of the law for such judges, one of which is that they must be members of the People's Party, if there are such in the township. This is clearly shown to be the spirit and intention of the law, and is clearly manifested by the language used in giving the clerks this power, to-wit, that if " the chairmen of the State Executive Com- mittees, or either of them, shall have failed to recommend persons so qualified for said appointments, then the clerk shall appoint suitable persons, *having all the requisite qualifications herein described,* without such recommenda- tions."

It seems to me that there can be no doubt but that this language includes the requirement that the person appointed shall belong to the political party for which he may be appointed. But this does not prevent the clerk from selecting from the persons otherwise qualified of the political party for which he is making the appointment.

This is a public law, intended for the whole people, and the whole people are interested in the correct interpreta- tion and enforcement of the same. I therefore fail to see

anything in the objection to Mr. Harkins' bringing and prosecuting this proceeding. I am informed that *Judge Hoke* took the same view of this law that I have taken in the Salem case, which was recently before him. There, as I understand, the clerk, not having received the list from Mr. Ayer, appointed a Republican registrar for the People's Party. The Chairman of the Democratic County Committee applied for and obtained a rule on the clerk; the Republican was removed and a member of the People's Party appointed. I may not be entirely correct in stating the facts of the case before *Judge Hoke*, but I state them as I have heard them. If I have stated the facts correctly and his ruling, I agree with him. If it should be that I am mistaken as to the facts and ruling in the case referred to, it will not affect my own decided opinion of the law as above expressed.

This act (Sec. 7) provides "that the judges of the Supreme and superior courts shall exercise general super_visory power over the clerks in the execution and performance of all the powers, duties, directions and requirements of this act." This I construe to give me the power to inquire into the manner in which the clerk has discharged his duty, and, if I find that he has not discharged it according to law, to overrule and correct him, and if I find that he has made appointments in violation of the law, to declare them void, and to require appointments to be made in accordance with the law, and to sustain his appointments where they have been made according to law.

I have now declared the law bearing on the case as I understand it. And this brings me to a consideration of disputed facts, which have given me much more trouble than the questions of law involved. And it seems strange to me that a man possessing the other requisite qualifications for a judge of an election should not have sufficient

prominence among his neighbors for them to determine to what political party he belonged. But such seems to be the case here.

While there are reasons for me to suppose that the defendant acted under a misapprehension of his rights in making these appointments (Mr. Davidson's advice), I shall give him the benefit of the presumption that he did right in making these appointments, unless it appears otherwise from the evidence or from his admissions, and that the burden (outside of admissions) is upon the plaintiff; that, acting under this rule, I find that C. B. Leonard, appointed for the first precinct, town of Asheville, W. W. Owensby for the second precinct, W. D. Justice for the fourth precinct, and G. W. Freeman are Populists; they so swear; and I give them credit for knowing to what party they belong and for swearing the truth, although there is evidence before me tending to show that W. D. Justice is now chairman of a democratic club in Asheville. I also find under this presumption that W. M. Jones is a Populist, although there is evidence showing that he is now one of the city aldermen of Asheville and was elected as a Democrat. At this time, when there are so many changes, I do not think this proves that he is not a Populist now; and I find upon the direct testimony of W. H. Wilson, corroborated by that of H. S. Harkins and not contradicted by any evidence, that W. P. Brown, J. M. Ingles, C. C. McCathey, W. P. Kilpatrick, N. A. Miller, R. V. Wolfe, Jas. Reese, W. C. Penland, James Patton (or Jos. Patton, whichever it may be), C. C. Murray, G. W. Curtin, Jesse Williams, H. C. Blankenship, H. J. Miller, George Harris, R. P. Lewyllen, J. W. Bowling, Jas. Foster, W. E. Pounder and William Gaddy are not Populists; that finding, as I do, that C. B. Leonard, W. M. Owensby, W. D. Jus-

tice, J. N. Jones and G. W. Freeman are Populists, and holding, as I do, that where the defendant (the clerk) complied with the law in making the appointments, the parties so appointed are rightfully in and entitled to hold their offices, the same are by me affirmed.

But as to W. P. Brown, J. M. Ingles, C. C. McCathey, W. P. Kilpatrick, N. A. Miller, R. V. Wolfe, James Reese, W. P. Penland, James or Joseph Patton, C. C. Murray, G. W. Justice, Jesse Williams, H. C. Blankenship, J. W. Bowling, R. J. Miller, Geo. Harris, R. P. Lewyllen, Jas. Foster, W. E. Pounder and W. Gaddy not being members of the People's Party, I hold and declare they were not lawfully appointed and are not entitled to hold and exercise the functions and to perform the duties of said offices to which they were so wrongfully and unlawfully appointed, and that they are hereby removed from said offices to which they have been wrongfully and unlawfully appointed; and said offices, to which they have been so appointed, are declared to be now vacant.

It is admitted in defendant's answer that he has made no appointment of judges for the Populist Party for the first and second precincts of Reem's creek, and none for Avery's creek and Black mountain precincts. So, the offices of judges for the Populist for these four precincts are, by the admission of defendant's answer, found and declared to be vacant as to the People's Party.

There has been some evidence before me intended to show that the People's Party of Buncombe county are satisfied with defendant's appointments. I cannot consider such evidence. I have no right or power to consider such evidence as this. My duty is to find what the clerk did and declare the law arising thereon. When this is done, my duty is done.

There is some evidence introduced intended to show that some of the parties designated by Hal W. Ayer as State Chairman of the Populist party are Republicans. But I have nothing to do with this matter; it is not before me. I do not say but that, under proper proceedings against a State Chairman, this matter might be inquired into. Neither do I say that it could. I give no opinion as to that. But what I am deciding and what I do decide is that when the State Chairman makes his designation, within the time provided by the statute for him to do so, then the clerk has no discretion, and it is his duty to make the appointments as designated; that, if there are any appointments made by the clerk, not especially noticed herein, they are affirmed.

ORDER: It is therefore considered, adjudged and ordered that the defendant, J. L. Cathey, as Clerk of the Superior Court of Buncombe County, proceed at once to fill the vacancies now existing in the offices of judges of election on the part of the People's Party, for precincts No. 3, No. 6, No. 7 and No. 8 in the city of Asheville, these offices being declared by me to be now vacant, and that he proceed at once to fill the places for which the following persons were appointed by him, and whose offices are now declared vacant, and for the respective precincts for which they were appointed, to-wit, W. P. Brown, J. M. Ingles, C. C. McCathey, W. P. Kilpatrick, N. A. Miller, R. V. Wolfe, James Reese, W. C. Penland, James or Joseph Patton, C. C. (or J. C.) Murray, G. W. Justice, Jesse Williams, H. C. Blankenship, A. J. Miller, J. W. Bowling, George Harris, R. P. Lewyllen, James Foster, W. E. Pounder and William Gaddy.

And the clerk will also proceed at once to fill the vacancies now existing in the 1st and 2d precincts of Reem's

HARKINS *v.* CATHEY.

creek and in Avery's creek and Black mountain precincts.

And as these offices are now vacant, and it being admitted that he has now in his possession a list of names furnished him by Hal W. Ayer, State Chairman of the People's Party, for the various precincts, he will forthwith and without delay proceed to fill said vacancies by appointing the persons so named and designated by the said Hal W. Ayer as Chairman aforesaid; and if the said Hal W. Ayer shall have failed to name and designate names for any one or more of said precincts, he will at once proceed to appoint and fill the same from the People's Party. Such appointees of his, if it shall be necessary for him to make of persons not designated by said Ayer, shall have the other qualifications provided by said Act of 1895.

And he will make known to me, *at Chambers*, at the Supreme Court Building in the city of Raleigh, N. C., at 12 o'clock M. on the 29th day of October, 1896, how and in what manner he has observed, kept and obeyed this order and judgment. This the 26th day of October, 1896.

The plaintiff will recover his costs of defendant.

(Signed)          D. M. FURCHES,
*Associate Justice Supreme Court, N. C.*

The Sheriff of Buncombe county, N. C., will execute this order forthwith upon its receipt by delivering a copy of the same to J. L. Cathey, clerk of the superior court of Buncombe county, N. C., and make due return thereof to me forthwith. This October 26, 1896.

(Signed)          D. M. FURCHES,
*Associate Justice Supreme Court, N. C.*

From this order the defendant appealed to the full bench.

119—42

HARKINS *v.* CATHEY.

*Mr. J. W. Graham*, for plaintiff.
*Messrs. Shepherd & Busbee*, for defendant (appellant).

FURCHES, J.: The Court being of the opinion that the opinion, findings and judgment of the court below were correct and should be affirmed if the act of 1895, Ch. 159, known as " The Election Law," is constitutional;

And it having been decided in the case of *McDonald* v. *Morrow*, at this Term, that said act is constitutional, therefore, adopting the discussion of the constitutional question in the case of *McDonald* v. *Morrow* and the opinion of the court below for the discussion of the other matters involved in the case as the opinion of this Court, the judgment appealed from is affirmed.

AVERY, J. (dissenting) : Without questioning the conclusion reached by the learned justice from whose judgment the appeal was taken upon the merits, I dissent from the opinion of the Court on the ground that he had no jurisdiction of the subject matter of the action, and the Legislature had no power to confer such jurisdiction upon him. In Section 8, Article 4 of the Constitution, the jurisdiction of the Supreme Court is defined to extend,

1. To reviewing on appeal any decision of the *courts below* upon any matter of law or legal inference.

2. To giving the same jurisdiction over " issues of fact " and " questions of fact " as were exercised by the same Court before the adoption of the Constitution of 1868.

3. To issuing remedial writs necessary to give it a general supervision and control over the proceedings of inferior courts.

In Section 12 of the same article of the Constitution it is provided that " the General Assembly *shall* allot and distribute that portion of this power and jurisdiction which does not pertain to the Supreme Court among *the*

*other courts prescribed in this Constitution or which may be established by law."*

It is not contended, neither can it be plausibly insisted, that a single justice of the Supreme Court is a court other than the Supreme Court, or can be constituted a separate court by legislative enactment. Whatever he does under color of authority purporting to be granted by an act of Assembly it must be conceded is done without changing the character of his office or assuming the role of a distinct officer created by such statute. In the opinion (by Chief Justice PEARSON) in *Clark* v. *Stanley*, 66 N. C., 59, the Court hold that " a public office is a public agency," and the person who is appointed to perform the agency is a public officer, and, hence, that to attempt to confer upon the President of the Senate and the Speaker of the House the power to appoint proxies and directors in all public corporations was an attempt to clothe them with a new and additional office. Hence, in such cases, the person appointed is precluded from holding the new office under Section 7, Article 14 of the Constitution. If it be conceded, as it seems to me it will be, that the attempt to clothe a justice of the Supreme Court with this power creates no new office, then it is plainly in violation of the Constitution to vest in him jurisdiction which that instrument declares " shall be " allotted and distributed either to courts other than the Supreme Court prescribed by the Constitution or which may be established by law. This provision is clear and mandatory as to whom the Legislature shall clothe with jurisdiction, and clearly a single justice of the Supreme Court comes within neither of the classes mentioned in that section. If the people, through the organic law, have bound the Legislature by solemn mandate, expressed in unmistakable terms, to confer " all jurisdiction " " which does not pertain to the Supreme

Court" upon two other classes of courts specified, and a single justice of the Supreme Court comes within neither classification, then the attempt to give the powers mentioned in the election law, in so far as the act imposes upon him jurisdiction to pass upon the rights of property of the citizens of the State, is unconstitutional and void.

The power that pertains to the Supreme Court, as a court, to issue remedial writs clearly cannot be conferred upon a single member but only upon the organized body. Therefore, I conclude, upon more mature reflection, that it is in violation of the Constitution to impose upon a single justice of the Supreme Court any of the powers that the Legislature has attempted to confer upon that Court. What I have written so far is applicable to all of the election cases where the original hearing has been had before, and the appeal taken from the judgment of, a justice of this Court.

But, in this particular case, the controversy involved the right of certain persons to act as registrars of election under Section 7, of Chapter 159 of the Laws of 1895, known as the Election Law, and the opinion of the Court sustains the right of a single justice of this Court to order the removal of a registrar or judge of election after he was appointed by the clerk of the superior court of Buncombe county under said section, and had been inducted into office because the clerk had not followed the requirements of said section as construed by this court, in the selection of persons belonging to different political parties, and in acting on the recommendation of the chairmen as therein prescribed.

I am not disposed to question the correctness of the construction given to the section of the statute under consideration. But certain persons had been appointed and

inducted into office as registrars on the fifth day of October and had continued to act until the 24th of the same month. The conclusion of the Court is that a justice of the Supreme Court had authority to order the clerk to remove those incumbents and induct into office the persons whom he ought to have appointed at first, under the construction placed upon the act by this Court. To this ruling I wish to dissent also upon other grounds.

In *Worthy* v. *Barrett*, Justice READE delivering the opinion of the Court, said that every person who is appointed or elected under the provisions of law to discharge a public duty and is required to take an oath to support the Constitution of the United States (as registrars and judges are required to do under said Section 7) is a public officer. A further evidence that one is an officer, as distinguished from a mere placeman, is the fact that the law allows him fees and emoluments (as does our statutes, Section 50, Ch. 159, Laws of 1895). As already intimated, Chief Justice PEARSON went further in *Clark* v. *Stanly, supra*, and for the Court announced the principle that the right " of appointing to a public office constitutes of itself a public officer." I will not suffer myself to be diverted from the proposed line of my argument by discussing the question suggested by the announcement of this principle, to sustain which Chief Justice PEARSON relied upon what he denominated that " mine of learning, *Hoke* v. *Henderson*, 4 Dev., 1. But it would seem difficult to show that the power of appointing judges and registrars of election was not an attempt to confer upon a clerk another office while admitting that the power to appoint railroad directors was an attempt to give to the presiding officers of the two branches of the Legislature dual official duties growing out of the new agency for the public. The principle decided in

*Clark* v. *Stanley, supra,* was approved in *Eliason* v. *Coleman,* 86 N. C., 235, and *Cloud* v. *Wilson,* 72 N. C., 155.

An office is property, and the Legislature cannot deprive an incumbent of his right to it by merely clothing another official with arbitrary power to remove. *Hoke* v. *Henderson, supra.* This principle is too familiar to warrant any elaboration of it.

If, then, it be conceded that the registrars who had qualified and entered upon the discharge of their duties on the 5th of October were incumbent officers on the 24th of October, and had a property in the offices, it seems to me to follow that no judge or justice could proceed to adjudicate the question involved in the face of the constitutional provision (Sec. 19, Art. 1) that "in all controversies at law respecting property the ancient mode of trial by jury is one of the best securities of the rights of the people and ought to remain sacred and inviolable." The law points out clearly how the boards of County Commissioners shall proceed in inducting a Sheriff into office. Suppose the Legislature should pass a statute empowering a judge of the superior court, a justice of the Supreme Court or all of the members of that Court to remove one incumbent and substitute another without the intervention of a jury, would any lawyer hesitate to pronounce the act unconstitutional? Yet, the definition of a public officer in all of the recent decisions of this Court as clearly covers a registrar or judge of election as a Sheriff, and I cannot see why the Legislature might not with the same propriety and show of authority attempt to give a single judge or justice supervisory power over the Board of Commissioners in the induction of Sheriffs and clerks into office, including the right of removing one already inducted. Without denying the correctness of the interpretation of the law affecting registrars and judges, it seems to me that the Con-

stitution protects them against such summary methods of ejectment as fully as it does him who is in possession of land and appears on a preliminary hearing to be a trespasser from being ousted without the intervention of a jury. But it is contended that, because the Legislature has clothed single justices of the Supreme Court with certain other powers which have been exercised by them without question, therefore, whatever may be its language, it follows that it was not an infringement on the organic law to authorize them to direct the clerk of the Court to remove an officer after his induction into office. If all of the statutes granting authority were analogous to that before us for construction, which I do not concede, it would not follow that two or a dozen infractions of the Constitution, which had so far gone unchallenged, should authorize the Legislature to disregard its provisions again, and the courts to lend their sanction to the claim of the legislative rights to do so.

The case of *In re Bryan*, 60 N. C., 1, and other cases reported in the same volume and relied on as authority, were decided in 1863, before the provisions of the Constitution of 1868, which are now before us for consideration, were passed, and involved the right of the Supreme Court judges of this State to issue writs of *habeas corpus* to inquire into the rightfulness of the detention of prisoners by Confederate officers.

But, supposing that the Constitution of 1868 had then been adopted, the remedy provided in compliance with the Constitution (Art. 1, Sec. 18) for all persons restrained of their liberty is, under the provisions of the statute (*The Code*, Sec. 1623), the ancient writ of *habeas corpus*. The Constitution required the Legislature to furnish an adequate remedy, and when it was declared that all such persons should have the right to " prosecute a writ of

*habeas corpus* " it followed, *ex vi termini*, that they were entitled to demand this remedy before any judge or any court of general jurisdiction in this country.   The power of all judges to grant it was conceded before Magna Charta, and was only reaffirmed, like many other cardinal principles, in that instrument and those that followed reaffirming it. Hurd on Habeas Corpus (2nd Ed.), p. 132 ; Church on Habeas Corpus, Sec. 3.  From the earliest times it extended to all cases of illegal imprisonment, and the jurisdiction was exercised by the judges of King's Bench, Chancery and Common Pleas.   Blackstone says (3 Com., pp. 40 to 44) of all of these courts that they exercised as well original as appellate jurisdiction, and some of them acted upon judicial questions in courts of *nisi prius*.   3 Bl. Com., p. 59 *et seq.*   When in England the right to prosecute a writ of *habeas corpus* was granted it was construed to authorize an application to any of these judges.   So, when the Constitution enjoined upon the Legislature the duty of providing a remedy, and in the exercise of that duty they passed the statute, the right to " prosecute that writ " implied the right to apply to any judge of an inferior court of general jurisdiction or a court of appeal.   Besides all this, the right to bring persons before a court, whose presence is necessary in order to the exercise of its powers, like the right to try its own officers for alleged *torts* or criminal acts done under color of office, is inherent in every court of general jurisdiction, and its exercise is essential to the preservation of its power and dignity.   *State* v. *Hoskins*, 77 N. C., 530, 534.

The power to commit to answer a criminal charge is the converse of that to relieve from illegal restraint.   It has been held from the earliest English history to be inherent in every judicial officer clothed with jurisdiction to try criminal offences, so that the creation of any such office

HARKINS *v.* CATHEY.

carries with it to the incumbent the right to issue a warrant for arrest and conduct a preliminary examination. It is the beginning of the exercise of criminal jurisdiction and passes whenever the jurisdiction is given. Thus Section 27, Art. IV confers the authority on justices of the peace to try certain criminal offences, and this grant of jurisdiction carries with it by implication the right to conduct preliminary examinations under such regulations as the Legislature may prescribe.

The order in the exercise of a police power that a person convicted on a trial for bastardy or any other criminal offence shall be sent to the workhouse till he work out the cost, as has been decided in the late opinions in bastardy cases, is not a sentence or judgment rendered upon the trial of an action. The power is entrusted to boards of commissioners as well as justices of the peace, not for the purpose of inflicting punishment but to protect the public. The superintendent of an insane asylum is empowered to compel patients to work on the farms attached to such institutions, and the authority is exercised, not as a punishment but sometimes to promote the health of the patient and sometimes to get the benefit of his labor as a contribution towards his own support. Neither the County Commisioners nor superintendents of asylums, in the cases we have referred to, can be said to impose a sentence or usurp the jurisdiction of a court.