A. J. OVERTON, JACK JOHNSON, PAUL PERRY, C. F. JERVIS, MRS.
W. P. CHANEY, MISS MYRTLE BENNETT, MISS AUDREY SAUN-
DERS, LUTHER TWEED AND GLENN MORGAN, ON BEHALF OF THEM-
SELVES AND ALL OTHER CITIZENS AND QUALIFIED VOTERS OF THE CITY OF
HENDERSONVILLE v. THE MAYOR AND CITY COMMISSIONERS OF
THE CITY OF HENDERSONVILLE, TO WIT, MAYOR A. V. EDWARDS,
I. E. JOHNSON, TOM CLARKE, BEN FOSTER, AND ROY WILLIAMS,
COMMISSIONERS; RAYMOND P. ENGLISH, REGISTRAR; FRANK
WALDROP AND I. B. HUGHES, JUDGES; AND I. T. OLSON, JOHN
F. McLEOD, JR., AND MELVIN S. HATCH, COMMISSION; AND M.
J. WORLEY, R. B. SHEALEY AND HUGH WHISNANT, CONSTITUTING
THE BOARD OF ELECTIONS OF THE CITY OF HENDERSONVILLE.

(Filed 9 November, 1960.)

1. **Elections § 4—**

 The determination of the qualification of a voter is addressed to the
 election officials, and a watcher has the right only to challenge a voter
 and, in the event the voter is permitted to vote, to have such voter
 write his name on the ballot for identification if there is a later in-
 quiry as to the validity of the election, but a watcher is not entitled
 to conduct an examination of each of the voters he challenges, and
 when a watcher seeks to take charge of the inquiry the election officials
 may request him to cease impeding the progress of the election and to
 leave the polling place.

2. **Elections § 7—**

 Where challenged voters have been required to sign their names on
 the ballots pursuant to G.S. 163-168, and an order is issued impounding
 all papers, books, ballots and reports relative to the election, movants,
 having been given the right to inspect the impounded documents, should
 check the poll books against the registration books to ascertain whether
 any unqualified persons were allowed to vote if they seek to obtain
 evidence upon which to challenge the election.

3. **Elections § 4—**

 It is a violation of G.S. 163-172 for a judge of elections to mark
 the ballots for voters without any request for assistance by the voters,
 or, in the event of a request for assistance, to fail to return the mark-
 ed ballot to the voter in order that the voter may see how it was mark-
 ed before putting it in the ballot box.

4. **Same—**

 The ignorance, neglect or misconduct of an election official, in the
 absence of actual fraud participated in by the voter, cannot deprive
 such voter, if he is otherwise entitled to vote, of his right to cast
 his ballot, or render his vote invalid.

5. **Elections § 2—**

 The failure of a registrar to administer the oath prescribed by law
 to an elector before registering him, and the registration of voters by
 persons other than the registrar, does not deprive the elector of his
 right to vote or render his vote void after it has been cast.

**6. Elections § 10—**

In an action to restrain municipal officials from proceeding pursuant to an election approving the sale of wine and beer within the city, evidence tending to show only irregularities on the part of election officials not vitiating the ballots cast, together with evidence tending to show the casting of ballots by unqualified voters in a number insufficient to affect the result of the election, is insufficient to vitiate the election, and nonsuit is correctly entered.

MOORE, J., took no part in the consideration or decision in this case.

APPEAL by plaintiffs from *Fountain, Special Judge,* 27 June 1960 Special Civil Term, of HENDERSON.

This is an action instituted by the individual plaintiffs, alleged citizens, residents and electors of the City of Hendersonville, North Carolina, to restrain the defendant city officials from putting into effect a system for the sale of beer and wine in the City of Hendersonville, and to have the special election held in said city on 2 March 1960 declared null and void. In said election 1,038 votes were cast for the sale of beer and 682 votes were cast against the sale of beer; 1,017 votes were cast for the sale of wine and 694 votes were cast against the sale of wine.

The amended complaint, hereinafter referred to as complaint, alleges the names and offices of the defendants as follows: A. V. Edwards, I. E. Johnson, Tom Clark, Ben Foster, and Roy Williams are the Mayor and City Commissioners of the City of Hendersonville. Raymond P. English is a citizen and resident of Hendersonville and was appointed registrar of the special election called by the governing body of said city to be held on 2 March 1960. Frank Waldrop and I. B. Hughes were appointed judges for said special election by the aforesaid governing body. I. T. Olsen, John F. McLeod, Jr., and Melvin S. Hatch constitute the commission designated by the governing body of the City of Hendersonville to regulate and supervise the legal sale of beer and wine in said city.

In paragraph 12 of the complaint it is alleged that between seven and eight hundred names were entered upon the registration books of the City of Hendersonville as new voters during the period of time from the fourth Saturday preceding the special election and the date of the election, 2 March 1960.

It is alleged in paragraph 13 of the complaint, upon information and belief, that more than 350 of the persons whose names were listed in the registration books during the period referred to above, were not administered oaths as required by law and that a large number, and specifically more than two hundred persons whose names

were entered on the books during said period of time, were not residents of the City of Hendersonville and were not qualified by reason of nonresidence and otherwise to vote in said special election.

In paragraph 14 of the complaint and the subsections thereof, it is alleged that the Mayor and City Commissioners of the City of Hendersonville were without authority to call the election, in that the petitions required by law were defective in numerous respects and did not bear the names of fifteen per cent of the registered voters who voted for the governing body of said municipality in the last election in said municipality. It is further alleged that the resolution passed by the Mayor and City Commissioners calling the election did not comply with certain statutory requirements.

In paragraph 15 of the complaint and subsections thereof, it is alleged, among other things, that 150 names placed on the registration books were entered thereon by persons other than Raymond P. English, the registrar; that a large number of the names were entered on the registration books after said books were required by law to be closed. It is further alleged that hundreds of persons were registered who did not possess the necessary educational qualifications to vote or were otherwise disqualified to vote.

In paragraph 16 of the complaint it is alleged upon information and belief that on election day the election officials designated to conduct the special election entered into a plan and conspiracy with James A Stutts, a resident of the City of Raleigh and an ·employee of the Beer Association of North Carolina, and with one Ben Israel, a resident of Hendersonville, pursuant to which scheme, plan and conspiracy the said James A. Stutts and Ben Israel brought to the polling place in the City of Hendersonville on election day hundreds of persons who were not qualified to vote, many of whom were nonresidents of the City of Hendersonville and many of whom were not registered for said special election. In subparagraph (a) of paragraph 16 it is alleged that James A. Stutts, a nonresident of the City of Hendersonville, entered within the polling place and enclosure thereof on numerous occasions and there talked to voters singly and in groups attempting to influence them to vote in favor of the sale of beer and wine in the City of Hendersonville. It is further alleged in subparagraph (b) of paragraph 16 that James A. Stutts paid money to numerous voters after they had allowed Frank Waldrop to mark their ballots without requesting him to do so. In paragraph (c) of this same paragraph of the complaint it is alleged that Ben Israel went out and about the outskirts of the City of Hendersonville and brought to the polling place a large number of persons,

as the plaintiffs are advised, informed and believe, more than one hundred in number, whom he knew to be nonresidents of the City of Hendersonville and not qualified to vote; that he promised to said persons that if they would go to the polling place, take a ballot from the election officials and hand it to Frank Waldrop without asking any questions, that he, the said Ben Israel, and the said James A. Stutts, would pay to said persons money, give them whiskey, or give them orders for chickens or other produce. In subparagraph (e) of the aforesaid paragraph it is alleged that James A. Stutts and Ben Israel did issue and deliver to more than 150 persons who came to said polling place slips of paper authorizing the bearer thereof to pick up a chicken or procure whiskey at Israel's store, known as the Greasy Pig, and that Ben Israel did honor the said certificates and did give to said persons chickens and other produce or whiskey as consideration for said persons forfeiting their right to vote and permitting the said Frank Waldrop to mark the ballots issued to them.

Paragraph 21 of the complaint alleges that the registrar and judges of said special election never met as a Board of Canvassers to determine the result of said election as prescribed by G.S. 160-48 and G.S. 160-49.

It is likewise alleged in paragraph 22 of the complaint that the election returns were never canvassed as required by law.

In paragraph 24 of the complaint it is alleged that a fair and impartial conduct of said election, free from the fraud and corruption and unlawful acts of the defendants would have produced a different result from that wrongfully announced by the defendants.

It is alleged in paragraph 25 of the complaint that a majority of the qualified voters of the City of Hendersonville voting in said special election were against the sale of beer and wine in the City of Hendersonville and that their ballots so indicated, but because of the unlawful and fraudulent conduct of the defendants acting in concert and the furtherance of their criminal violation of the election laws, the will of the people of Hendersonville was defeated.

The evidence bearing on these allegation will be set out in the opinion.

During the course of the trial, Ben Israel, William B. Powers, Mrs. Raymond P. English, and James A. Stutts, who were original defendants, moved for a dismissal of this action as to them. The motion was allowed. This appeal does not challenge the correctness of this ruling.

At the close of plaintiffs' evidence the defendants moved for judgment as of nonsuit. The motion was granted. The plaintiffs appeal and assign error.

*Don C. Young and Lamar Gudger for plaintiffs.*
*Arthur B. Shepherd, R. L. Whitmire, L. B. Prince for defendants.*

DENNY, J. The only question for determination on this appeal is whether or not the court below committed error in allowing the motion of the defendants for judgment as of nonsuit.

The evidence tends to show that approximately eight hundred additional persons were registered while the registration books were open, for the special election held on 2 March 1960. The regular registration books of the City of Hendersonville were used and a new registration for the special election was not ordered.

The evidence offered below in support of the allegations in paragraph 13 of the complaint, to the effect that more than 350 of the persons registered for the special election were not administered oaths as required by law and that more than 200 of these persons were non-residents of the City of Hendersonville, is in substance as follows: Paul Perry, one of the plaintiffs herein and one of the duly appointed and sworn watchers for the dry forces, testified that he challenged 176 voters, practically all of whom were Negroes. Of this 176, he named 41 who were challenged on the sole ground that the oath was not administered to them by the registrar at the time they were registered. Four were challenged but no reason given. One voter was challenged on the ground that he did not have an oath administered to him at the time he registered and that he stated he could not read or write, another on the ground that he did not know who registered him and that he was not administered the oath at the time he registered. Twenty-one others were challenged on the ground that they were registered by Ben Israel or some person other than Raymond P. English, the registrar, and on the further ground that the oath was not administered to them at the time they were registered. This accounts for 68 of the 176 challenged voters by Paul Perry for the dry forces. There is no evidence tending to show on what ground the remaining 108 voters were challenged. Furthermore, there is no evidence tending to show that any person was challenged on the ground that he was not a resident of the City of Hendersonville or on the ground that such challenged voter was not registered.

M. F. Toms testified that on 1 March 1960, Raymond P. English, the registrar, came by his office; that upon inquiry Mr. Eng-

lish informed him that he had registered about 800 new people for this special election and that he administered the oath to about one-half of them at the time of their registration; that he had registered all of them except about thirty, and these were registered by Chief Powers and his (the registrar's) wife at his request. Chief Powers is a brother-in-law of English. The witness further testified that he got the impression that the thirty persons were registered by Powers and Mrs. English at times when Mr. English was at lunch.

No evidence whatever was offered in support of the allegation contained in paragraph 14 of the complaint with respect to the lack of authority of the Mayor and City Commissioners to call the election on account of the defective petitions or otherwise. Neither does the record disclose any evidence tending to support the allegation in said paragraph to the effect that the resolution passed by the Mayor and the City Commissioners calling the election did not comply with certain statutory requirements:

The evidence does not support the allegation of paragraph 15 of the complaint to the effect that 150 names were placed on the registration books by persons other than Raymond P. English, the registrar. The evidence tends to show that at most not more than thirty persons were registered by persons other than the registrar. Moreover, there is no evidence to support the further allegations in said paragraph to the effect that hundreds of persons were registered who did not possess the necessary educational qualifications to vote or who were also otherwise disqualified to vote.

The evidence adduced in the trial below does not tend to support the allegations in paragraph 16 of the complaint, to the effect that the election officials entered into a plan and conspiracy with James A. Stutts and Ben Israel pursuant to which scheme the said James A. Stutts and Ben Israel brought to the polling place in the City of Hendersonville on election day hundreds of persons who were not qualified to vote, many of whom were nonresidents of the City of Hendersonville, and many of whom were not registered for said special election. Neither does the evidence tend to support the allegations in subparagraph (a) of paragraph 16 to the effect that James A. Stutts, a nonresident, entered within the polling place and enclosure thereof on numerous occasions and there talked with voters singly and in groups, attempting to influence them to vote for the sale of beer and wine.

In the hearing below, A. B. Rhoads, the first witness for the

plaintiffs, testified that he spent practically the whole day at the voting place on the day of this special election. "I saw Mr. Waldrop (one of the judges) pick up a voter and go with him into the booth as many as a dozen times or more. I was there practically the whole day. * * * That was the day of the big snow, one of the heaviest snows we've ever had here and it snowed all day long. I never saw Mr. Stutts on the inside of the voting enclosure at all. I never saw Mr. Israel on the inside of the voting enclosure."

The evidence in support of subparagraph (b) of paragraph 16, to the effect that James A. Stutts paid money to numerous voters after they had allowed Frank Waldrop to mark their ballots, tends to show that on some three or four occasions Stutts did give money to prospective voters. He was seen to drop a fifty-cent piece on the floor and a colored man to whom he was talking picked it up and put it in his pocket. On another occasion he was observed giving a colored man what looked to be a dollar bill. At another time he was observed giving coins to three colored men. On still another occasion Stutts was told by a colored boy that certain folks were out in his car but refused to vote until they were paid what they were promised; that Stutts gave him some bills and said: "Now, if that's not enough to take care of you, see Mr. Ben Israel."

The allegation in subparagraph (c) of paragraph 16, to the effect that Ben Israel brought to the polling place more than one hundred persons whom he knew to be nonresidents of the City of Hendersonville and not qualified to vote, is not supported by the evidence. Further allegations in subparagraph (c), to the effect that if the more than one hundred persons which Israel brought to the polling place would take a ballot from the elections officials and hand it to Frank Waldrop without asking any questions, the said Ben Israel and the said James A. Stutts would pay to said persons money, give them whiskey, or give them orders for chickens or other produce, are not supported by the evidence. The evidence does disclose that many persons were brought to the polling place by Ben Israel, and that after Stutts talked to them outside the polling enclosure he would place them in the voting line and give a signal to Mr. Waldrop by a nod or wink and Waldrop would go into the booth with the voter after he had been given a ballot, and that Waldrop would mark the ballot, and on many occasions the voter would not accompany him into the booth. Part of the time Waldrop would return the marked ballot to the voter and the voter would put it in the ballot box. But in many instances Mr. Waldrop would deposit the ballot himself. Grover Redden, one of the sworn watch-

ers for the dry forces, testified that Mr. Waldrop assisted at least a hundred voters in this way. The evidence further tends to show that these voters did not request Mr. Waldrop to assist them in marking their ballots.

The evidence with respect to the allegation in subparagraph (e) of paragraph 16, to the effect that Stutts and Israel issued and delivered to more than 150 persons who came to the polling place, slips of paper authorizing the bearer thereof to pick up a chicken or procure whiskey at Israel's store and that Israel honored the certificates, does not support the allegation. There was evidence, however, tending to show that three certificates were given to two voters; that each certificate called for the delivery of a chicken by presenting the same at Ben Israel's place of business, but the record does not reveal any evidence that the slips or orders entitled the bearer thereof to any whiskey or that any whiskey was delivered to anyone by Israel or anyone else in exchange for these orders for chickens.

M. A. Butler testified that he had previously lived in Hendersonville and had registered for a previous election in Hendersonville, but that he was not a resident of the City of Hendersonville at the time of the special election; that he voted therein as a consequence of a conversation with Ben Israel. This witness further testified that about two hours after he voted, Ben Israel gave him two slips of paper, each one for a chicken, signed "Ben J. Israel, 244 Third Avenue East, * * *." This witness also testified that Ben Israel "did say he would see that I got paid for having voted." The evidence does not disclose whether Butler voted for or against the sale of beer and wine.

There is no evidence tending to support the allegation in paragraph 21, to the effect that the registrar and judges did not comply with the provisions of G.S. 160-48 and G.S. 160-49. Neither is there any evidence in the record to support the allegation in paragraph 22 of the complaint, that the election returns were never canvassed as required by law. The allegations in paragraphs 24 and 25 of the complaint as set out hereinabove, are not supported by the evidence.

James A. Davis, a minister, who had lived in Hendersonville since 1 January 1960, did not register while the registration books were open, thinking that he had to be a resident for ninety days before he could register. The registrar, Mr. English, informed him that he was eligible after thirty days and offered to register him on election day and did so. This witness voted against the sale of beer and wine.

Davis was a sworn watcher for the dry forces and testified that he had theretofore stated, " * * * that the people who had worked at the polls * * *, including both the dry and wet people, * * * were very courteous and cooperative. * * * I was there all day as a watcher and went there for that purpose. To the best of my ability I was on the alert and kept my eyes open all day long. At the time I made the observation concerning the election officials being courteous, I did not make any comment or observation about anything being wrong there." This witness also testified that he helped count the ballots.

The appellants complain about one of the sworn watchers, Jack Johnson, being told that he must leave because he was impeding the progress of the election. Johnson, according to his version of the matter, apparently felt that he had the right to conduct an examination of each of the voters he challenged rather than have the challenge noted and the voter sign his name on the ballot, as required by G.S. 163-168. The registrar permitted the challenged voter to vote after he had written his name on the back of the ballot. Johnson testified that his challenge of the voter was based solely on the ground that the voter had not been administered an oath when he registered.

The law does not contemplate that a watcher or any other person may take charge when he challenges a voter at the polls and conduct a hearing with respect to the voter's right to vote. The inquiry with respect to the voter's qualifications to vote rests with the election officials, and when such challenged voter is permitted to vote, before voting he must write his name on his ballot for identification "in the event any action should be taken later in regard to the voter's right to vote." G.S. 163-168.

It might be noted that no voters were challenged on challenge day, as provided in G.S. 163-78.

It appears from the evidence that 140 voters signed their ballots pursuant to the provisions of G.S. 163-168; that of these 140 voters, 129 signed their ballots pursuant to the challenges made by Paul Perry, one of the watchers for the dry forces, and that all 129 persons voted for the sale of beer and wine. Jack Johnson and Paul Perry were the only persons who challenged any voters at the polling place during this special election.

On 28 March 1960, an order was entered pursuant to a motion interposed by plaintiffs in the office of the Clerk of the Superior Court of Henderson County, impounding all paper writings pur-

porting to be a petition or petitions for an election on 2 March 1960 on the question of the sale of beer and wine in Hendersonville, together with all the registration books, poll books, ballots, marked and unmarked, reports and records of the Board of Elections, etc. Such order gave the respective attorneys the right to inspect the impounded documents in the presence of the Clerk, his deputy, or such other person appointed by him for such purpose. Even so, it does not appear that the poll books were checked against the registration books to ascertain whether or not the persons challenged, or any other persons, voted without having been registered, as alleged, and if registered whether or not such voters lived within or without the City of Hendersonville.

We think the evidence is sufficient to support the conclusion that Waldrop, one of the judges, and Stutts did have an understanding that Waldrop was to take the ballots of those voters identified by Stutts and to mark them for the sale of beer and wine. Unquestionably, Waldrop was guilty of violating both the letter and the spirit of G.S. 163-172, in that the evidence tends to show that without any request for assistance by the voter, Waldrop volunteered his services at least a hundred times and marked the ballot for the voter, and on many occasions deposited the ballot in the ballot box without offering to return the marked ballot to the voter so he could see how it was marked before putting it in the ballot box.

Irregularities are revealed by the evidence on this record on the part of the election officials, as follows: (1) The failure to administer the oath to many persons who registered for this special election. (2) The conduct of Waldrop in marking the ballots of voters without being requested to do so. (3) The registration of voters by persons other than by the registrar.

The questions raised on this record are not new. It is regrettable that all too often election officials are careless and indifferent with respect to the proper discharge of their legal duties. On the other hand, in the absence of actual fraud participated in by an election official or officials and the voter, voters are not to be denied the right to vote by reason of ignorance, negligence or misconduct of the election officials.

It is the duty of a registrar to administer the oath prescribed by law to electors before registering them, but his failure to perform his duty in this respect will not deprive the elector of his right to vote or render his vote void after it has been cast. *McPherson v. Burlington*, 249 N.C. 569, 107 S.E. 2d 147. *Quinn v. Lattimore*, 120 N.C. 426, 26 S.E. 638, 58 Am. St. Rep. 797; *Gibson v. Commis-*

*sioners,* 163 N.C. 510, 79 S.E. 976; *Woodall v. Highway Commission,* 176 N.C. 377, 97 S.E. 226; *Davis v. Bd. of Education,* 186 N.C. 227, 119 S.E. 372; *Plott v. Commissioners,* 187 N.C. 125, 121 S.E. 190; *Glenn v. Culbreth,* 197 N.C. 675, 150 S.E. 332.

In *Gibson v. Commissioners, supra,* it is said: "* * * a statute prescribing the powers and duties of registration officers should not be so construed as to make the right to vote by registered voters depend upon a strict observance of the registrars of all the minute directions of the statute in preparing the voting list, and thus render the constitutional right of suffrage liable to be defeated, without the fault of the elector, by fraud, caprice, ignorance, or negligence of the registrars * * *. A constitutional or statutory provision that no one shall be entitled to register without first taking an oath to support the Constitution of the State and that of the United States is directed to registrars, and to them alone; and if they through inadvertence register a qualified voter, who is entitled to register and vote without administering the prescribed oath to him, he cannot be deprived of his right to vote through this negligence of the officers."

In the case of *Quinn v. Lattimore, supra,* the Court said: "It appears that a number of persons were registered by other persons than the regularly appointed registrars; in one instance, by the son of the registrar in the absence of his father; and in another case by Williams, the register of deeds, with whom the registrar had left the registration books. These registrations were irregularly made and might have been rejected and erased by the registrars. But it would not have been fair for them to have done this without notifying the parties, so registered, in time for them to have registered again. But instead of their doing this, they retained these names on their books, which they and the judges of election used on the day of election, thereby ratifying and approving these registrations. And it would now be a fraud on the electors, as well as on the parties for whom they voted and also upon the State, to reject these votes for this irregularity. These votes cannot be rejected for this reason. * * *

"A vote received and deposited by the judges of election is presumed to be a legal vote, although the voter may not have complied with the requirements of the registration law; and it then devolves upon the party contesting to show that it was an illegal vote, and this cannot be shown by showing that the registration law had not been complied with. Pain on Elections, sec. 360. A party offering to vote without registration may be refused this right by

the judges for not complying with the registration law. But, if the party is allowed to vote and his vote is received and deposited, the vote will not afterwards be held to be illegal, if he is otherwise qualified to vote. * * *"

In the case of *Woodall v. Highway Commission, supra,* this Court quoted from McCrary on Elections, 3rd Edition, section 216, page 143, as follows: "The doctrine that whole communities of electors may be disfranchised * * * because one or more of the judges of election have not been duly sworn, or were not duly chosen, or do not possess all the qualifications requisite for the office, finds no support in the decisions of our judicial tribunals."

With respect to Waldrop's misconduct, there is no evidence tending to show that a single ballot was cast contrary to the wishes of the voter casting such ballot. Furthermore, with the exception of M. A. Butler, referred to hereinabove, there is no evidence of any probative value tending to show that any other nonresident of the City of Hendersonville voted in said special election or that any person who was not registered voted therein. The record, therefore, discloses that only one nonresident voted in the special election and only one voter was challenged on the ground that he could not read or write.

We hold that the misconduct complained of with respect to the election officials, falls within the category of irregularities and is insufficient to upset the result of the special election held on 2 March 1960. *Hendersonville v. Jordan,* 150 N.C. 35, 63 S.E. 167; *Casey v. Dare County,* 168 N.C. 285, 84 S.E. 268; *Davis v. Bd. of Education, supra; Glenn v. Culbreth, supra; Forester v. N. Wilkesboro,* 206 N.C. 347, 174 S.E. 112; *Phillips v. Slaughter,* 209 N.C. 543, 183 S.E. 897.

There are some irregularities in many elections — as much as they are to be deplored — but, as a general rule, the misconduct of election officials will not vitiate an election unless it is shown that the result was affected thereby. *Plott v. Commissioners, supra.*

The evidence before us in this action is insufficient to sustain the view that the result of the election would have been changed had it not been for the irregularities pointed out herein. Even so, we do not approve of the conduct of Waldrop, Stutts, or Israel. The conduct of Stutts and Israel in giving money and orders for chickens was reprehensible and indefensible. The evidence tends to show that they violated the provisions of G.S. 163-197, which makes it a felony for any person to give or promise or request or accept at any time, before or after any election, any money, property or other thing

of value whatsoever in return for the vote of any elector.

Fraudulent conduct of third parties, in the absence of evidence to the effect that the election officials participated therein, will not vitiate an election unless the evidence shows that as a result of such fraudulent conduct a sufficient number of illegal votes was cast to change the result of the election.

A careful consideration of the record before us leads us to the conclusion that the judgment as of nonsuit entered below was proper and must be upheld.

Affirmed.

MOORE, J., took no part in the consideration or decision of this case.